Okay. I think we're good to go. Okay. May it please the Court, my name is Linda Scott and I'm the attorney for Appellant Halayne Kasoff in this matter. I would like to reserve three minutes for a rebuttal argument, please. This is a case that was dismissed on summary judgment by the District Court. The material question or the material facts that we believe are in dispute are the definition of any one period of expense as well as whether or not an insurance company can create a situation where they then utilize that situation to decline benefits to or refuse benefits to an applicant. If you look at the policy itself, the policy itself does not in anywhere discuss the denials that were used by the insurance company bankers. For example, the limitation on benefits says nothing about additional causes. The insurance policy is replete with definitions. It never defines cause. The average and ordinary person will define the same cause or causes as the triggering event to give them the benefit. Ms. Kasoff's daughters, like any good daughters, decided when their mother was in her 70s that they're going to go out and buy an insurance policy to try to make sure that they have something for their mother in their elder years. You have an insurance company who caters to the elderly, says we're here for you for the life of your retirement. The daughter, Leslie Kasoff, speaks to an insurance agent the day that she purchases the ______. Let me see if I can understand how, in your view, the policy should work. In my view, the policy says the same cause or causes. So I would say that if someone, for example, like Ms. Kasoff, hurts her knee or shoulder, that she ______. Let's just go through her scenario here. So first, she had the policy for a number of years, and she hurt her knee. Correct. And she applied for benefits, and they gave her benefits. That's correct. Correct? Okay, somewhere along the line, and the exact date's really probably immaterial here, but she hurt her shoulder. She fell and injured her shoulder. And she applied for benefits for her shoulder as well. Correct. Now, was that at the same time she was receiving benefits for her knee? My understanding is that it was approximately two weeks after she had completed receiving some benefits for her knee. Okay, and they said no. Correct. And there was a little dispute. Litigation ensued, and they resolved it, and she got benefits for her shoulder. Correct, utilizing a reasonable implementation of that definition. Okay, but apparently that was as a result of the litigation. There was a settlement. Yes. Right, okay. Move along, and she injures her knee, unfortunately, through a trip and fall. Correct. Right, while she's receiving benefits for her shoulder. That is correct. Okay, but she didn't apply for benefits for her knee, new knee injury, at that time. That's correct. Benefits for the shoulder end, and she applies for benefits for the knee. That's correct. Okay, and they say no. That's correct. Why was that not what the policy provides? Because the policy provided that if the understanding in the normal person, a reasonable understanding of it, is if she needed to get additional benefits for her shoulder, she would have to wait six months, and have no benefits for six months on her shoulder, to then reapply for her shoulder, because the definition says for the same cause or causes. So what happens is if you look at the actual definition, see, Your Honor, I guess. Well, if you read it, it says, any one period of expense begins when the insured first incurs expenses covered under the policy, right? Right. It ends when, for six consecutive months, the insured is no longer receiving long-term care services for the same cause or causes for which the previous period of expense began, right? That's right. So if you take it literally, doesn't that mean if she needs anything whatsoever, she doesn't get any more benefits, even for a new injury? If there were, I understand what the Court is saying, but what I can say is this. The average person, the ordinary reasonable person, has, for example, like myself, a car policy. And if I have an accident on Street A, and then I have an accident on Street B, even if my insurance policy is covering my accident on Street A, it isn't going to deny me as long as I've been paying my premiums coverage on B. It's going to be a separate incident. And if the insurance, if the policy had, if to me, if that were the intent and if my client understood that at the time of purchase, because she also had conversations with the salesperson that explained it to her to make her understand that this would be a covered event. If the ordinary person doesn't think that they are going to have any unrelated, for example, you know, you fall and break your knee and then two weeks later you happen to have a stroke, but you may not need benefits for that stroke for two years, Bankers is going to say you had that stroke while we were giving you benefits for your knee, so therefore your stroke is not covered. To me, it's a material, it's at best an ambiguity, because to be frank, my client didn't think it was ambiguous at all. Her understanding, and I think a reasonable understanding was, it's for the same cause or causes. So no, she couldn't get any benefits for her knee, her initial knee incident, until she went six months. And then no, she couldn't get anything for her shoulder, unless she was home care shoulder free for six months. But for unrelated causes, and these are admitted three distinct and separate events, that it would be covered. And like I said, if you look at the policy, it has exclusions, acts of war, intentional self-inflicted injuries, services provided by a member of the immediate family, due to mental illness, due to supply, you know, services. It doesn't exclude concurrent causes. It doesn't exclude it. There are no benefit limitations on it. This was a policy written in 2001. And you know, Your Honor, what's interesting to me is counsel, after the documents were submitted, there was a new case that was actually a district court case, which actually kind of baffled me that the district court, that a defendant would want this court to look at a district court case that, number one, is up on appeal, but number two, this court tells that court what to do. So I wouldn't necessarily think that it's something that this court should consider, except looking at the case, I do have certain things to say. For example, my client's policy was in 2001. This policy was in 2008. My client's policy termination would be her mortality. This policy in 2008, it is now there is a lifetime benefit of probably twice the amount. And we're not talking some exorbitant amount. We're talking, let's say it started, I believe, at $70,000, and now it would be $80,000 per event. So if you look at, for example, a car policy, whatever you pay per month, if you have several incidences, you file several claims. They're separate and distinct. And if someone has a reasonable understanding that that separate and distinctness applied here, which is what was the case here, not later, but at the time of the purchase. So in your view, there should not, policy should not be interpreted to impose a six-month waiting period for unrelated injuries from the original cause. For unrelated, because that's how it was marketed, that's how it was sold, and that was what was the understanding of my client at the time of purchase. Well, so we have to look at the, what the district court did was just look at the text of the policy and ask, is this ambiguous? Said, no, it's not ambiguous. It means just what Jack Bucklow said. No, I understand that that's what the court said, but I also think the court didn't even understand the far-reaching effects of that decision. Because, for example, bankers can look at my client's mental, excuse me, physical state, or it could be mental state, and say, for example, she has difficulty putting on her bra. So therefore, she can never, ever, ever get another policy benefit. And I actually deposed the vice president of bankers, and I said to her, let me make sure I'm clear here. Are you saying, and I'm paraphrasing, that you have a person here who you're taking their monthly premium from them every single month, and you know, sitting here right now, that you will never, ever, ever give them a benefit again? And the response was, she can cancel. So the bottom line was... Well, the district court, you know, went on to say, your interpretation would create the possibility of serial payments with no washout period, and that it would increase the insurance benefit exponentially. Are these concerns worth thinking about? Well, what I was concerned about, Your Honor, is an insurance company that's marketing this policy to the elderly. I'm speaking for people who are old and can't speak for themselves. I'm here because I have an elderly lady who can't afford to be here. I'm here because bankers wrote the policy. They set the premium. I didn't tell them to say that, and I most certainly think that if there were an additional cause, for example, in her denial letter it said, no, this is not the same cause, but it's an additional cause. If these definitions were so important to the insurance company, then most certainly, cause, unrelated, the fact that something that was unrelated to an initial event could be an exclusion. It all should have been spelled out for the person who's trying to get benefits so that when they reach their elder years, they have an opportunity to stay in their home, to be able to function. This is their policy. It's not my policy. If I wanted to exclude any unrelated event and knew that it was a denial in perpetuity and I would give them one benefit only, I would have spelled it out. And I think that it's something that a jury, I think it's something that should be heard by the court and let a trier of fact decide because while it might seem, you know, let's say unambiguous on its face if the court looks at that, I also believe that the affirmations that were made during the torture should count. And by the way, I would like the court to look at, for example, there is a Bankers v. Roe case, and that is in that case what bankers did was bankers said to the court, I would like to have the insurance salesperson come up and testify that I didn't, you know, we didn't mean for this to be a long-term care policy. So bankers wanted in that case the salesperson to be able to testify. In this case, bankers is saying whatever the salesperson said doesn't mean anything. This agent has nothing to do with bankers. And so on its face it's clear. It's not clear to the average person if you understand it one way and you say, well, let me make sure I understand. And the person, salesperson says to you, yes, this should be covered. And by the way, that reasonable understanding was what was employed to give that second benefit. May I ask you a question? Yes, sir. Good. You had a lot to say there in response to Judge Nelson's question. Let me ask, from your perspective, how is this supposed to work if there are concurrent causes? So here, for example, there was much in the record about the shoulder. She needed care for the shoulder after the benefits had terminated. And then she needs care for her knee or care related to her knee, I guess it would be. Okay. So I'm sorry. So what is it? Does she get a full benefit payment for just for the knee that also provides benefit to the shoulder? How does this all work? Well, since it wasn't spelled out in the policy and there is nothing that precludes concurrent claims, I guess she could from the policy itself. But it depends on what her doctors say in terms of what her needs are. I mean, I'm not sure if I'm understanding your question correctly. Well, I'm just curious about what, you know, because they do claim that the care plan that was provided, you know, identified matters relating to her shoulder that was offered in support of her knee. And to be frank, the matter related to her shoulder and had to do with her being able to put on her bra. And she testified that, you know, her caregiver testified she can put it on. But I think there was a distinction made between, you know, if I saw any elderly person and I went to help them, it doesn't mean that medically they need the help. It means that I'm trying to be a nice person and I'm caring for them. All right. Thanks. Go ahead. Does this literally come down to whether she needed help to put on her bra? Well, that was a main issue. That was a main issue here. But, you know, I believe it. Otherwise, she didn't need any more services for her shoulder for six months? Other than she was having injections to enable her to function better. But that was a main issue. And did that have to do with her shoulder? Yes, it did. Well, I suppose that is a service or whatever that word was, long-term care service, I suppose. Well, thank you. Okay. We'll give you a minute of rebuttal time, but let's hear from the insurance company, from bankers. Good morning, Your Honor. Steve Hufford representing Bankers Life and may it please the Court. Excuse me. Would you raise the microphone? There we go. Can you hear better? Speak up a little. Two things I want to talk about here. Number one are the issues that have been raised on the policy itself, which is all the district court considered for reasons that I will explain. And secondly, I'm going to go into the extrinsic matters that have been attempted to be raised, and I don't believe are properly before the Court. The issue here is nothing more or less than can there be a policy limit on a long-term care policy. And the district court correctly noted what the appellant would do, what their definition would do is make this into an unlimited lifetime benefit policy with no cap whatsoever. Well, that can be true because it ended after whatever the maximum amount was for the shoulder injury. The issue is whether then she can start a new period of benefits for the knee injury. But every concurrent cause, every concurrent thing that you're getting care for can potentially, under the appellant's reading of the policy, result in additional benefits ad infinitum. The way this policy works, just to go back to basics, it is a long-term care policy. And what it actually covers, it doesn't specifically cover if you've got a knee or a shoulder. It covers either cognitive impairment, which we never had here. Ms. Kasoff never had cognitive issues. Or it covers physical issues which cause an inability to care for two or more of your activities of daily living, bathing, dressing, toileting. It doesn't really matter. When you go on claim and you're on claim, it doesn't matter what the reason is why you can't do those activities. So in other words, you only get one shot, that's it? No, you get one shot unless you go back to the beginning and you look at what started that care. I want to look at the appellant's hypothetical. You break your arm. And this policy has a weekly maximum. It has a maximum for any one period of expense. And then it has a weekly maximum. And if you divide them, it comes out to a year. It's 52 weeks. You get 52 weeks of care. So actually, she's been longer than that because she's not using the full extent. Her periods of expense have tended to last a couple years. But at a minimum, you're going to get one year of care. You break your arm. You need four months of care. You have a stroke at the termination of that four months of care. You've still got eight months of benefits on that policy. Then, when you've played out those eight months of benefits, the company would go back and look and say, well, what started this period? What started this period was the broken arm. You haven't had any care for your broken arm for eight months. You can get another period of care for the consequences of the stroke. And you don't have to wait six months? No, you don't have to wait six months. It's been six months. You've been eight months of care only for the stroke. So it has been six months since you received long-term care services for the cause or causes that started it in the first place. So there's no ambiguity here. The period of expense begins, as Your Honor noted, begins when the payments begin, and it ends when you have been six months without care for the same cause or causes. That's what allows you to reset the clock. That's what allows you to restore your benefits. But if that thing you get is chronic, and the evidence is undisputed that her shoulder problem is chronic, it is never, ever, ever going to get any better. Why are you still collecting premiums? She's still paying them. Why don't you tell them, you know, you might want to cancel this benefit? We have told them that. They don't want to cancel it. We have said, hey, by the way, this has run out. They keep paying the premiums. They keep making claims. There's nothing in the policy, though, that says if you have a chronic condition, you may not want to, you know, this policy will terminate. Let's not use the word chronic, but to say that six months without treatment, without long-term care services for the same. But you don't say treatment. When you actually define it, do you define it in a way that? Long-term care services is defined broadly. It doesn't just include people coming into your home. It includes any therapeutic, any diagnostic services related to that cause. So what it means is if you have a chronic condition, unless you get better from that chronic condition for six months, after that condition has caused you to spend $78,000 for long-term care, that is the limit on the policy, and it will not reset. So why shouldn't you be stopped or something, at least in this case, from denying it since you continue to collect premiums when you're claiming she'll never recover? We cannot cancel her policy unilaterally. We cannot. Well, then it must mean that she should be able to collect some benefits. At some point. If you keep paying the premium, knowing what the company has said over and over again, that's something we can't prevent. And that's not before. That issue is not before the court. Well, you know, as the district court pointed out, the question is when you look at the policy and the provisions in play, you have to ask whether or not they're ambiguous. Correct. If any ambiguity is construed against the maker. But ambiguity has to be in the facts of this case. It cannot be hypothetical. That's looking at the Bank of the West case that appellant cited, page one of their brief. Page one of their brief. Ambiguity must be on the facts of this case. And it is undisputed the period started for the shoulder. She hasn't gotten better from the shoulder. To this day she needs services from the shoulder, as far as we know. So it has never been six months without care. And it's more than just her bra. She has arthropathy. She has bone on bone in her shoulder. It's affecting not only bra, and the reason it's important is it's dressing. It's part of dressing. It is an activity of daily living. It also affects bathing. It also affects other activities of daily living. It's all in the record over and over again from her caregivers, from her doctors, from an expert we hired that has never, ever had a motion to strike. There's no explicit provision in the policy that excludes concurrent causes, right? I think there is. Where? Activities of daily living. The cause, as I said, the cause of what starts it is only relevant, is only relevant to the restoration of benefits. The triggers under the policy are simply your inability to do the activities of daily living. If I just go to the policy and look how it functions or how it operates, it starts out with a whole series of definitions. It does. Right? A lot of definitions, like three pages worth of definitions, four pages. Then it goes to benefit provisions. Benefit. Right? How to qualify for benefits. You qualify for benefits by either being unable to perform two or more activities of daily living or being cognitively impaired. It doesn't say anything. About why or how? It doesn't say anything about the period of expense. No, but that's in there. That's a limit in the very front, the deck page of the policy. Where is that? The deck page of the policy is the first or second page of the policy. It says there's a policy limit, $80,000 for any one period of expense, and there's a weekly limit. Oh, I see. Maximum benefit for any one period of expense is $81,668.75. Yeah, that's been updated. That's how it sits currently. There's a 5% escalator on the policy, annual escalator on the policy. For any one period of expense. And there's a weekly maximum. And as I said, if you divide one by the other, you get 52. Okay, so then? And it says we will not pay any more than the maximum benefit for any one period of expense for any and all claims under the policy. The only way to get more than the maximum period of expense is to restore the benefits. You have to have unrelated injuries where the original cause has completely eliminated. You have to have gotten over for six months the thing that caused you to go on claim in the first place. Isn't it ambiguous to say that a policy is non-cancelable and at the same time to say that if you get an injury that would require some sort of service, although not benefits under the policy, that that prevails over the non-cancelable? Well, it's non-cancelable. I think it has to be by law in California. You can't issue a cancelable long-term care policy. So it has to be cancelable only by the policyholder, not the company. That's what that means. Why wouldn't the company write her a letter and say, hey, look, you know, we understand you have this policy. We understand you've got a chronic condition. You know, you might think twice about maintaining this policy. Two lawsuits where we said if you don't get better from the first thing, you're not going to get any more benefits. I mean, I don't know how much clearer we can convey the message that if you don't recover from the thing that puts you on benefits, you're not going to get any more benefits. We don't have control over whether the policyholder decides to stop payment. And she said she deposed the vice president. And I haven't seen that testimony, but counsel said that the vice president of claims said you can always cancel the policy. You can always cancel the policy. But doesn't it sort of flaunt California law? Excuse me? If California law says something can't be canceled, aren't you sort of flaunting it in the way you've treated this? No. It simply means that the company can't unilaterally end the policy. Can't just say, I'm sorry, you're not going to have coverage anymore. As long as you keep paying the policy, you're going to have a policy in force. But it is in force. Your Honor, I want to point out, this was never an issue that appellant or plaintiff raised. We keep paying premiums. Why don't you cancel the policy? I mean, I'm sure there's evidence in the record that letters have been sent that say you may want to consider canceling your policy. I know. It's a standard clause in the letters when we tell them you're not going to get any more benefits. So let me talk about the extrinsic. These issues were never raised in the district court. Look at the brief in opposition to the motion for summary judgment that we filed. It says, page 67 of the record, resolution of the breach of contract issue rests upon interpretation of the words of the policy. Plaintiff agrees. So any error that might be asserted on the affidavits of either Ms. Kazoff or her daughter were invited. You can't tell the district court, oh, this is an issue of pure contract interpretation, and let the district court decide it on that basis, and then appeal on the basis of extrinsic evidence. It's invited error and it's waived. You can consider, you have the ability to consider non-waived issues, but only in very circumscribed. You guys had some pretty good luck in resolving the second dispute, right, through a settlement? Settlement. Did you try and settle this current dispute? I'm sure we did. Well, were you involved in any settlement? I don't remember if I went to a mediation or not. I mean, you can't anymore. You can't get the resolution without some effort in settling the case. You know, our court has a fantastic mediation program. And we went through it, and we weren't able to get the case. Did you actually meet with the mediator? Did you discuss with the mediator the possibility of getting together and trying to settle the case? We went through it. We talked to him on the phone, yes. All right. So, in any event, can't sandbag. Can't bring up stuff that the district court never got a shot to rule on. As far as other issues, other problems with it, I mean, even if you don't find that it's waived, Leslie, the daughter, is not the policyholder. Anything she says that somebody told her is utterly irrelevant. It would be the understanding of the policyholder. And here, based on the application in paragraph 9 of the complaint, Helaine is the policyholder. She is the owner. What was said to someone other than the policyholder is irrelevant. Statute of limitations problem on something that was said in 2001, parole evidence rule. There's also a statement in the brief that there were no limitations, no notice of the limitations of these alleged agents, and they're not even named in any of the applications. It just says agents. The application itself has the clause no agent can pass on risk, modify the contract, anything like that. That's in there. That's at 48, record 48. So they are asserting modification. They're trying to say the words of the policy don't matter. What matters is what we were told back in 2001, that is somebody modifying the terms, waiving requirements of the policy, which is not allowed. There's also just been no effort to say what the elements of estoppel are and whether the evidence here would meet them. Also, there's been, during this appeal, the thing has been on shifting ground. The original argument was, okay, you are estopped because you settled the first lawsuit, and that meant that we were delayed in the end of benefits, and you're trying to say that we can't get a restoration of benefits because our benefits stopped being paid. That's not what the policy says. The policy says you have to stop receiving long-term care services. So we pointed that out in the appellee's brief, and in the reply brief it came back that the settling the first case and not paying it right away meant that she didn't recover from benefits. And, again, there's absolutely no evidence of that. It's undisputed that her condition is chronic, and she will never recover from it. Okay. I see my time is up. Thank you. Appreciate your argument. You have a minute for rebuttal. I'm from New York. I can do it really quickly. First of all, in terms of mediation, just so that the court understands, what Mr. Huffer said was absolutely not accurate. What happened was I initially got a call from the firm that said they wanted to engage in mediation. I gave them some judges' names. And this is at the district court level. The very next day, the judge in the district court. I wasn't talking about the district court. I'm talking about here at the main circuit. And I was going to say I was moving to here. And what happened here was that we were on the phone, and Mr. Huffer said that he did not want to mediate. And your mediator then called me back and said I'm going to talk to him some more and called me back and said they do not want to mediate. So we did not mediate in this venue. So I just want to make that clear. The second thing is, and I believe that the court heard it itself, and I think this was one misunderstanding by the district court. When you talk about the six-month washout period, counsel himself has said he believes, or his bankers are asserting, that my client has a chronic condition for which she will never, ever, ever get a benefit again. And while he says that they cannot cancel the policy by California law, however it was set up, maybe there is a policy that they can set forth or they can sell in California where they can have the ability to cancel. I don't know that, but what I can certainly say here is that the policy is ambiguous. I believe that in terms of the way it's marketed, when you're here for seniors, everyone knows what is $70,000 or $80,000 going to do for anybody these days in terms of care. So if a company wants to be here for seniors, they either should be here for seniors or they should explain to the seniors what they really are here for and what the benefit entails. Bankers Life has a policy that they will give you one benefit. After you get that one benefit, you will never, ever, ever. And for example, when someone says someone has a chronic condition, I'm not a doctor. And whether a condition is chronic doesn't mean that it will or will not interfere with the activities of daily living. So most certainly there would need to be more. And what ends up happening, too, is finally, and I think just to say, that bankers urged the appellate court in one of its cases, once I said bankers versus Roe, to say we want to know what was said when the policy was purchased. Our salesperson said that it wasn't marketed the way you said it is. And therefore, I submit. Thank you, Ms. Scott. Thank you.  Have a good day. Thank you, Counsel. Our next case for argument is United States of America versus.
judges: D.W. Nelson, Paez, Bucklo